**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
**HARVEY P. FAUST, JR.,**                            :
                                                     :
                              **Plaintiff,**         :          **REPORT AND**
                                                     :          **RECOMMENDATION**
       **-against-**                                 :
                                                     :          **06 Civ. 4577 (KMK)(LMS)**
**MICHAEL J. ASTRUE**[1]                             :
**Commissioner of Social Security,**                 :
                                                     :
                              **Defendant.**         :
-----------------------------------------------------------X

**TO:   THE HONORABLE KENNETH M. KARAS, U.S.D.J.**

Harvey P. Faust brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review

of the final decision of the Commissioner of Social Security (the "Commissioner"), which found

that he was not entitled to disability insurance benefits under the Social Security Act ("the Act").

Currently pending before the Court are Plaintiff's motion and the Commissioner's cross-motion

for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure

Docket #'s 9, 10.[2]  For the reasons that follow, I conclude, and respectfully recommend that

Your Honor should conclude, that Plaintiff's motion for remand should be granted, the

Commissioner's cross-motion should be denied, and the Commissioner's determination should be

remanded for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

---

[1] Michael J. Astrue became Commissioner of Social Security on February 12, 2007.  Therefore, in accordance with Federal Rule of Civil Procedure 25(d), Michael J. Astrue is substituted as the Defendant in this action for Jo Anne B. Barnhart.

[2] The docket sheet reveals that although Plaintiff provided a copy of his Memorandum of Law to my Chambers, he failed to file it with the Clerk of Court.  Docket numbers 9 and 10 are the Commissioner's filings.  Plaintiff's Memorandum of Law will be docketed when this Report and Recommendation is docketed.

## I.   <u>BACKGROUND</u>

### A.   <u>Procedural History</u>

On April 26, 2004, Plaintiff protectively filed his application for a period of disability and disability insurance benefits, alleging October 3, 2003, as the onset of his disability. Administrative Record ("AR") 76.  Plaintiff alleged that his disability, including tremors and torn ligaments and muscles in his left hand, caused swelling, loss of movement and shaking, making it "impossible to work."  <u>Id.</u> 69.  Plaintiff's application was denied on July 13, 2004, on the ground that Plaintiff "could have performed light work" between October 3, 2003, the alleged onset date, and March 31, 2004, the date Plaintiff was last insured for disability benefits. <u>Id.</u> 31, 34.  Thereafter, Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ").  <u>Id.</u> 35.  Plaintiff appeared in person for the September 23, 2005, hearing before ALJ Christopher P. Lee.  <u>Id.</u> 303.

Following the September 23, 2005, hearing, the ALJ issued a decision, on October 12, 2005, finding that Plaintiff was not under a disability within the meaning of the Act "at any time on or before March 31, 2004, the date he last met the disability insured status requirements of the Act."  AR 16-25.  Plaintiff filed a request for review of the ALJ's decision with the Appeals Council, along with a December 27, 2005, letter in connection with that appeal.  <u>Id.</u> 282.  On January 27, 2006, the Appeals Council denied Plaintiff's request for review.  <u>Id.</u> 285.  On April 19, 2006, setting aside the denial and considering "additional information," the Appeals Council once again denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner.  <u>Id.</u> 4.

On June 14, 2006, Plaintiff commenced the instant action in this Court (Docket # 1), alleging he is disabled and that the Commissioner's findings are not supported by substantial

evidence and are contrary to law and regulation.  On December 29, 2006, the Commissioner

filed an answer.  Docket # 6.  Thereafter, Plaintiff submitted a memorandum of law in support of

a motion for judgment on the pleadings on the grounds that the Commissioner failed to use the

proper legal standards in evaluating whether Plaintiff could perform work existing in the national

economy.[3]  The Commissioner filed a cross-motion for judgment on the pleadings (Docket # 9)

and a memorandum of law in support of that motion (Docket # 10) arguing that substantial

evidence exists to support the ALJ's decision denying disability insurance benefits.

### B.   **Medical Evidence**

#### 1.   **Evidence from Plaintiff's Treating and Consultative Physicians**

Preliminarily, Plaintiff alleges the onset date of his disability was October 3, 2003.  AR

76.  The Administrative Record, however, is void of medical records before February 10, 2004,

despite assertions made by Plaintiff's physicians in certain records that Plaintiff was first seen by

Liberty Family Medicine on April 3, 2002.  Id. 130, 164.  Nevertheless, according to the medical

records that *are* contained in the Administrative Record, Plaintiff sought consultation and/or

treatment from four physicians for his purported injuries: Dr. Kimberly Baptiste, Dr. Charles

Peralo, Dr. Prem Gupta, and Dr. Mohsin Khan.

Notably, on January 15, 2005, Plaintiff suffered a stroke and was hospitalized for three

days.  AR 272.  A large majority of the approximately 150 pages of medical records contained in

the Administrative Record are dated subsequent to Plaintiff's stroke, including over 80 pages of

records from Dr. Khan.

---

[3] A courtesy copy of Plaintiff's Memorandum of Law was received by my Chambers on June 5, 2007, but there is no indication on the docket sheet that Plaintiff filed his Memorandum of Law with the Clerk of Court.  See footnote 2, supra.

a.      Dr. Kimberly Baptiste

On February 10, 2004, Plaintiff was examined by Dr. Kimberly Baptiste, Plaintiff's

primary care physician associated with Liberty Family Medicine.  Dr. Baptiste reported that

Plaintiff complained of spontaneous tremors in the left upper extremity, dropping things, and

numbness and tingling in his hand.  AR 164.  Dr. Baptiste found that Plaintiff was in no acute

distress, was negative for Tinel's sign and Phalen's sign, exhibited no thenar wasting, and had

deep tendon reflex of 2/4+ in the upper left extremity.  Id.  Dr. Baptiste assessed Plaintiff as

tobacco dependent and having degenerative joint disease in his knees, carpal tunnel syndrome,

tremors and elevated blood pressure.  Id.  Plaintiff was referred to an orthopaedist and a

neurologist.  Id.

On June 14, 2004, Dr. Baptiste noted that Plaintiff visited Liberty Family Medicine for

completion of disability forms, and she noted tremors of Plaintiff's left upper extremity.  AR

164.  Plaintiff was also examined by Dr. Baptiste a day later, when Dr. Baptiste completed a

state disability determination evaluation.  Id. 130.  Dr. Baptiste reported on the evaluation that

Plaintiff was first seen on April 3, 2002, and the date of Plaintiff's last exam was June 14, 2004.

Id.  Dr. Baptiste's treating diagnosis was "tremor left hand" and high blood pressure.  Id.

Plaintiff's symptoms were tremors in his left hand and weakness and pain in his left forearm.  Id.

131.  Plaintiff's left forearm strength was 2/5+, left shoulder strength was 5/5+ and grip strength

was 2/5+.  AR 132.  Plaintiff's cranial nerves and deep tendon reflexes were normal.  Id. 133.

Plaintiff's motor was abnormal and his motor strength in the right upper extremity was 5, right

lower extremity was 5, left upper extremity was 2, and left lower extremity was 5.  Id.  Plaintiff

was able to walk unaided, walk toe-to-toe, walk heel-to-heel and rise from a squatting position.

Id. 134.  There was no significant abnormality in Plaintiff's gait.  Id.  Plaintiff's gross/fine

manipulation was abnormal, with his grip strength in the left upper extremity at 2/5+ and an inability to perform rapid alternating movements and fine manipulation.  AR 134.  Dr. Baptiste also reported abnormal movements in Plaintiff's left upper extremity, notably tremors of the hand.  Id.  Dr. Baptiste noted that Plaintiff's physical activity was limited due to pain and grip, and hyperparesthesia of the left hand and forearm.  Id. 136.  Plaintiff's ability to lift and carry was limited due to left arm weakness, and his ability to push and/or pull was limited due to left upper extremity weakness and pain.  Id. 136, 137.  He had no limitations standing and/or walking and sitting.  Id. 136.  Notably, Dr. Baptiste reported that "[she] cannot provide a medical opinion regarding this individual's ability to do work-related activities."  Id. 137.

Some time in early to mid January, 2005, Plaintiff visited Liberty Family Medicine for completion of disability forms.  AR 294.  A memorandum dated April 1, 2005, and signed by Dr. Baptiste, states that Plaintiff's initial visit for left upper extremity pain was in 2002, when Plaintiff had been complaining of pain for two months.  Id. 272.  At that initial visit, the range of motion in Plaintiff's wrist and hand was significantly decreased, with decreased sensation also in the fourth and fifth digits.  Id.  The memorandum notes that Plaintiff's subsequent return to Dr. Baptiste was in 2004 with similar complaints, as well as complaints of dropping things and numbness and tingling in the hands.  AR 272.  Dr. Baptiste reported that Plaintiff suffered a stroke on January 15, 2005, and also reported that Plaintiff's activities were significantly limited by his left upper extremity tremor and that the tremor was noted with intentional movement as well as at rest occasionally.  Id.  Further, Plaintiff had significant pain with prolonged movement on range of motion of the left upper extremity.  Id.  Dr. Baptiste opined that Plaintiff's prognosis for recovery was poor and that his condition was ongoing or would last at least 12 months, if not longer.  Id.  Dr. Baptiste did not believe that Plaintiff was able to do full time competitive work

due to his left upper extremity disability and his right upper extremity hemiparesis, noting that "[t]his has significantly limited any activity involving lifting, carrying, pushing and pulling." AR 272.

        b.    <u>Dr. Charles Peralo</u>

On February 20, 2004, Plaintiff was examined by Dr. Charles Peralo, an orthopaedist with Catskill Orange Orthopaedics, who reported that Plaintiff, a left-hand dominant male, complained of left wrist and arm pain and numbness for approximately one year.  AR 144.[4] Plaintiff reported to Dr. Peralo that he had sustained a fracture to his left wrist in 1969 and underwent carpal tunnel release surgery in 1972 and 1973.  <u>Id.</u>  During an orthopaedic evaluation of Plaintiff's left wrist and arm, Dr. Peralo observed minimal tremors with significant Tinel and Phalen sign.  <u>Id.</u>  Dr. Peralo also noted a decrease in sensation to the median and ulnar nerve distributions with a Tinel as to the left elbow.  <u>Id.</u>  He also noted Plaintiff had a good range of motion intact to the left elbow and to the left wrist.  <u>Id.</u> 145.  Dr. Peralo observed positive pronation and supination, tenderness to the volar aspect of the left forearm, and that Plaintiff was unable to fully extend his left first through fifth digits.  AR 144.  An x-ray showed no significant abnormality, however, Dr. Peralo reported that metallic fragments or foreign bodies were noted to the midshaft ulnar region.  <u>Id.</u>  Dr. Peralo's assessment was left hand flexor tenosynovitis, and that "[d]ue to the significant numbness to [Plaintiff's] left upper extremity, [Plaintiff] was given a prescription for an EMG of the left upper extremity to rule out any compressive neuropathy/carpal tunnel syndrome."  <u>Id.</u>  The records do not establish whether an EMG was subsequently performed.

---

[4] AR pages 263-64 are duplicates of the Catskill Orange Orthopaedics Initial Office Visit memorandum dated February 20, 2004, referenced herein as AR 144-45.

c.      Dr. Prem Gupta

Dr. Prem Gupta first examined Plaintiff on February 20, 2004, during a neurological consultation. AR 146. Plaintiff complained of pain in his left forearm and hand, distal to the elbow, and tremors to his left hand, both of about one year in duration. Id. Plaintiff told Dr. Gupta that he had been helping a friend move approximately one year prior to the examination, and about two days thereafter, he felt a sharp pain which became sore. Id. Plaintiff noted that, since that time, pain had increased in his left hand when he tried to use it, and his whole left forearm and hand became sore and cold. Id. Plaintiff also reported that the tremors in his left hand subsided when he rested his left arm on his lap and worsened when he held the arm in certain positions. Id. Plaintiff also reported that he could at times have tremors even at rest. Id. Plaintiff also reported that he still had mild aching in his left forearm but was able to "function essentially normal." Id.

Dr. Gupta noted that Plaintiff had been referred to him for suspicion of carpal tunnel syndrome. AR 146. He noted that Plaintiff's past medical history included a fracture of his left ulna and radius in December 1969, and that it had been almost two years after the fracture until Plaintiff's left arm was completely useful. Id. Dr. Gupta further noted that Plaintiff had subsequent surgery on his left hand. Id.

Dr. Gupta's physical examination revealed intermittent tremors of Plaintiff's left hand even when Plaintiff was sitting in a chair. AR 147. Dr. Gupta observed no tenderness at the left shoulder, left elbow, or extensor surface of the left forearm, but did observe tenderness at the flexor surface of the left forearm primarily over muscles and tendons. Id. He reported that when Plaintiff actively flexed his fingers, he experienced significant pain, however, passive flexion of the fingers did not induce any pain in Plaintiff's forearm. Id. A motor examination showed that

7

Plaintiff's strength, even in the left upper extremity, was essentially normal except Plaintiff was unable to fully flex the muscles of his left forearm due to pain. AR 147. Strength of all muscles was otherwise noted as 5/5. Id. Deep tendon reflexes were reported at 2+, symmetrical in both upper and lower extremities. Id. Plantar responses were noted as bilaterally downgoing. Id. A sensory examination to touch, pin, position, and vibration sensation was normal, even in Plaintiff's left hand. Id. Finger-to-nose and heel-to-shin tests of the right hand were normal, however with the left hand Plaintiff developed increased tremors. Id. Dr. Gupta reported that Plaintiff's tone in the left upper extremity was normal and his gait was normal. Id.

Dr. Gupta concluded that Plaintiff appeared to have developed tendonitis and myositis of the flexor muscles of his left forearm and that Plaintiff had essential tremors in his left upper extremity. AR 147. Dr. Gupta recommended obtaining Plaintiff's sedimentation rate and RA factor, prescribing a trial of prednisone, Lortab 10/500 mg twice a day as necessary, and Inderal LA 80 mg once a day, and requested a follow-up with Plaintiff in two weeks. Id.

Plaintiff visited Dr. Gupta on March 5, 2004, and March 26, 2004, at which times he complained of pain and tremors in his left arm. AR 148. On March 5, 2004, Dr. Gupta noted severe tenderness over Plaintiff's flexor tendons and prescribed additional medication. Id. On March 26, 2004, Dr. Gupta noted that tremors of the left arm persisted and he also prescribed medication. Id. Subsequently, Dr. Gupta examined Plaintiff on April 23, 2004, May 14, 2004, and June 18, 2004, and on each occasion, Plaintiff complained of pain and tremors in his left arm, except that on the last of these visits, Plaintiff complained of severe pain. Id. 149, 155. During the April 23, 2004, visit, Dr. Gupta observed a persistence of tremors in Plaintiff's left arm and marked tenderness at the left ulnar side of Plaintiff's elbow as well as over the ventral aspect of Plaintiff's forearm. Id. 149. On May 14, 2004, Dr. Gupta noted that tenderness at the

8

arm and tremors of the left arm persisted.  Id.  On each of those two visits, Dr. Gupta prescribed medication.  AR 149.  At the June 18, 2004, examination, Plaintiff's stretching of his fingers caused significant pain.  Id. 155.  It is unclear whether Dr. Gupta prescribed medication on that visit.

On July 15, 2004, Plaintiff returned to Dr. Gupta, complaining of severe pain and resting tremors in his left arm.  AR 165.  Plaintiff was examined by Dr. Gupta again on August 13, 2004, September 10, 2004, and December 23, 2004.  Id. 274, 275.  On August 13, 2004, Dr. Gupta noted that Plaintiff's tremors of the left hand persisted, and on September 10, 2004, Dr. Gupta reported that constant tremors of the left arm persisted and there was tenderness at the forearm.  Id. 275.  On December 23, 2004, Dr. Gupta noted that Plaintiff kept his left arm in a flexed position at the elbow and continued to have tremors at rest.  Id. 274.

On January 17, 2005, subsequent to his stroke, Plaintiff was again examined by Dr. Gupta.  AR 216, 223.  Dr. Gupta reported that Plaintiff clearly had evidence of new right facial and right arm weakness of sudden onset.  Id. 223.  Dr. Gupta noted that such evidence suggested an ischemic infarct in the left thalamostriate arteries or artery.  Id.  He also noted involuntary tremors of Plaintiff's left upper extremity of unclear etiology.  Id.

d.    Dr. Mohsin Khan

On January 17, 2005, subsequent to his stroke, Plaintiff was examined by Dr. Mohsin Khan.  AR 216, 223.  Dr. Khan's assessment was "transient ischemic attack (less than 24 hours), rule out cerebrovascular accident," and hypertension.  Id. 216.  Two days later, after tests, Dr. Khan's final diagnosis was cerebrovascular accident with right hemiparesis and facial droop and hypertension.  Id. 173.

     e.    <u>Catskill Regional Medical Center</u>

The Administrative Record contains two medical reports from Catskill Regional Medical Center that, while non-doctor specific, should be considered in the determination of Plaintiff's alleged disability.  Following Plaintiff's stroke, a January 19, 2005, Occupational Therapy Assessment from Catskill Regional Medical Center reported that Plaintiff was left hand dominant until two years prior when he had sustained nerve and soft tissue damage.  AR 171.  The assessment noted that Plaintiff had been right hand dominant for the past two years, had been out of work for two years since a left arm injury at work, and that he refused most testing on his left arm due to pain.  <u>Id.</u> 171, 172.

Additionally, a Catskill Regional Medical Center Physical Therapy Discharge Summary, dated January 21, 2005, reported general weakness, that Plaintiff's left arm was within functional limitations, his right arm had significant limitations in range of motion tests, and his manual muscle test showed that both arms had significant limitations but both legs were within functional limitations.  AR 167.

### 2.    <u>Evidence from the State Agency Medical Consultant</u>

On July 7, 2004, Dr. C. Wakeley, a state agency medical consultant, opined as to Plaintiff's residual functional capacity.  AR 156.  Dr. Wakeley described Plaintiff as a "52 year old man alleging tremors in hand and torn ligaments and muscles left hand."  <u>Id.</u>  Dr. Wakeley noted that exams during the time period when Plaintiff had been insured, October 3, 2003, to March 31, 2004, were normal except for intermittent tremor and pain in the left hand and forearm.  <u>Id.</u>  Dr. Wakeley reported that based on the information available for the period before March 31, 2004, Plaintiff could at least sit, stand, and walk for six hours, and could lift 20 pounds.  <u>Id.</u>  The Physical Residual Functional Capacity Assessment noted that Plaintiff could

occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk and sit for a total of about 6 hours in an 8 hour workday, and push and/or pull an unlimited amount, other than as shown for lift and/or carry.  AR 158.  Dr. Wakeley reported that these conclusions were based both on Plaintiff's allegations and on findings of a physical examination performed on February 20, 2004, by Dr. Gupta.  Id.  According to the assessment, Plaintiff exhibited no postural, manipulative, visual, communicative or environmental limitations.  Id. 159, 160.  Dr. Wakeley found not credible Plaintiff's allegations regarding his inability to lift anything requiring two hands.  Id. 160.  Dr. Wakeley reported that Plaintiff had normal strength and sensation, shopped once a week, cooked simple meals and played with his animals.  Id. 160, 161.  Dr. Wakeley noted that Dr. Baptiste had opined that Plaintiff had limited ability to lift, push and pull due to left arm weakness, but Dr. Baptiste did not specify how much weight Plaintiff could lift, nor did Dr. Baptiste respond to request(s) for additional information.[5]  Id. 161.  As a result, Dr. Wakeley reported that Dr. Baptiste's opinion was "non-specific and so therefore not adopted."  Id.

### C.   Other Evidence

Plaintiff was born on November 9, 1951, and he was 51 years old at the time of the onset of his alleged disability.  AR 130.  At the hearing, Plaintiff stated that he completed an eleventh grade education.  Id. 305.  He testified that he was divorced with one daughter who was 25 years old.  Id. 304.  Plaintiff stated that he had no job and/or vocational training.  Id.  He stated that he was "not very good" at reading or writing, he could go through a newspaper or a magazine to a point, and that big words stumped him.  Id. 306.  Plaintiff testified that he was laid off from his

---

[5] It is unclear from the assessment whether Dr. Wakeley made one or more requests of Dr. Baptiste for additional information.

job in October, 2003, and that he had received unemployment for 26 weeks.  Id.  He stated he was not looking for employment during this period of time because he was "going through the doctors with it, with [his] left arm."  Id.  Plaintiff testified that prior to his termination, he had worked at a summer camp for two seasons where he served as a handyman cutting trees, laying concrete, building walls, plumbing, roofing, painting, and whatever else had to be done.  AR 306.  Plaintiff had to lift or carry things by hand, and completed his work sitting, standing, crawling, and/or lying on his back under a sink.  Id. 307.  Plaintiff testified that at the end of the 2003 season, his injury affected him because he "couldn't do what [he] was doing," and "they were giving [him] little jobs where [he] could use one hand."  Id. 308.  He stated that prior to his stroke in January, 2005, he had been able to pick up about five to ten pounds.  Id. 312.  Plaintiff also stated he had had problems reaching over his head with his left arm in 2003 and 2004, but not with his right arm.  Id.  He testified that prior to his stroke, he had been able to run a vacuum and before he "got both arms messed up, [he] used to like building" model cars and trucks.  Id. 313, 314.  However, Plaintiff then testified that he had been unable to build model cars and trucks in 2003 or 2004.  Id. 314.

In addition to Plaintiff's testimony at the hearing, Plaintiff completed an application for disability insurance benefits, dated May 11, 2004, where he reported that he became unable to work because of his disability on October 3, 2003.[6]  AR 60.  Further, on an eight page disability report, dated May 11, 2004, it appears that Plaintiff was interviewed by L. Carlson.[7]  Id. 78.

---

[6] Yet, on a different form, Plaintiff reported that he stopped working on October 2, 2003, not as a result of his disability, but rather as a result of him being terminated from his seasonal employment due to it being the end of the resort season.  AR 70.

[7] There is no indication in the disability report as to the identity of "L. Carlson."  It is unknown from the record whether "L.Carlson" was an employee of the Government or whether

Carlson reported that Plaintiff's injury - tremors and torn ligaments and muscles in his left hand - first bothered Plaintiff on January 3, 2003.  AR 69, 70.  However, Plaintiff was unable to work because of his injury beginning October 3, 2003.  Id. 70.  Carlson reported that Plaintiff continued working after the date of his injury, and while he could no longer use a chainsaw or a jackhammer, he was doing lighter work such as cleaning and painting.  Id.  Importantly, Carlson noted that Plaintiff stopped working on October 2, 2003, because it was "the end of the resort season."  Id.  It was reported that Plaintiff, at his job each day, walked for 8 hours, stood for 8 hours, sat for 2 hours, climbed for 3 hours, handled, gripped or grasped big objects for 8 hours, reached for 2 hours, and wrote, typed or handled small objects for 2 hours.[8]  Id. 71.  Carlson also reported that Plaintiff used a chainsaw to clear trees and brush, then moved logs sometimes 20 to 30 feet, lifting a heaviest weight of 100 pounds or more, and frequently lifting 50 pounds or more.  Id.  Carlson observed that Plaintiff had no difficulty reading or writing.  Id. 77.  Carlson also observed that Plaintiff had difficulty using his hands and that his left hand was continuously shaking.  Id.

Approximately one month later, on a disability questionnaire dated June 14, 2004, Plaintiff reported that he could not lift anything that required two hands.  AR 85, 90.  In that questionnaire, Plaintiff confirmed that he started having pain in January, 2003, and that the pain started affecting his activities at that time.  Id. 88.  He also answered that kneeling was harder if

---

"L.Carlson" was a physician or an analyst.  It is assumed that the answers contained in this eight page disability report were the result of questions asked by L. Carlson of Plaintiff and typed by L. Carlson.

[8] The Court is aware that these hours exceed the maximum 24 hours in a day.  The Court assumes these numbers to be estimates and/or that certain activities were performed simultaneously.

it required two hands.  Id. 85.  Plaintiff reported that he did not need special help in taking care

of his personal needs or grooming, but that two hands accomplished the tasks faster.  Id. 81.

Plaintiff reported that since he first experienced the pain in January, 2003, it had not changed in

how it felt.  AR 89.  A June 18, 2004, disability report stated that Plaintiff was able to lift 0 to 4

pounds with his left hand and 25 pounds with his right hand, lifting 5 pounds frequently.  Id.

101.

There are several undated reports contained within the Administrative Record.  One of

those reports, a work history report, noted that Plaintiff worked maintenance on summer homes

from March, 2003, through September, 2003.  AR 91.  In an undated disability report, Plaintiff

reported that he frequently lifted 10 pounds in one job (Job Number 1) and 25 pounds in another

job (Job Number 2).  Id. 92, 93.  Further, on an undated disability questionnaire, Plaintiff noted

that from the time he woke up until 12 noon, depending on his pain, he had coffee, listened to the

radio, took a walk, fed his animals, and completed outside or inside work.[9]  Id. 100.

Plaintiff completed a disability report dated August 18, 2004, in which he reported that

there had been no change (for better or worse) in his injury since the last time he had completed

a disability report.[10]  AR 102.  In a questionnaire dated July 21, 2005, Plaintiff acknowledged

that he had "bad knees" in response to a question asking whether he has any other serious

medical conditions.  Id. 126.

---

[9] It is uncertain from Plaintiff's response what specific work he completed.

[10] Based upon the dated records contained in the Administrative Record, the last disability report
completed by Plaintiff prior to August 18, 2004, was in June, 2004.

II.     **APPLICABLE LEGAL PRINCIPLES**

    A.     **Standard of Review**

       The scope of review in an appeal from a social security disability determination involves two levels of inquiry.  First, the court must review the Commissioner's decision to determine whether the Commissioner applied the correct legal standard when determining that the plaintiff was not disabled.  Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999).  Failure to apply the correct legal standard is grounds for reversal of the ruling.  Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984).  Second, the court must decide whether the Commissioner's decision was supported by substantial evidence.  Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003).  "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id. at 106 (internal quotation marks and citations omitted).  When determining whether substantial evidence supports the Commissioner's decision, it is important that the court "carefully consider[] the whole record, examining evidence from both sides."  Tejada, 167 F.3d at 774 (citing Quinones v. Chater, 117 F.3d 29, 33 (2d Cir. 1997)).  "It is not the function of a reviewing court to decide de novo whether a claimant was disabled."  Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999) (citation omitted).  If the "decision rests on adequate findings supported by evidence having rational probative force, [the court] will not substitute [its own] judgment for that of the Commissioner."  Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002).  Moreover, the ALJ "has an obligation to develop the record in light of the non-adversarial nature of the benefits proceedings, regardless of whether the claimant is represented by counsel."  Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citations omitted).

15

B.     **Determining Disability**

In the context of disability benefits, the Act defines "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In evaluating a disability claim, regulations issued pursuant to the Act set forth a five-step process that the Commissioner must follow.  See 20 C.F.R. § 404.1520(a)(4).

First, the Commissioner will consider whether the claimant is working in "substantial gainful activity."  Id. at § 404.1520(a)(4)(i),(b).  If the claimant is engaged in "substantial gainful activity," then the Commissioner will find that the claimant is not disabled.  Id.  Second, the Commissioner considers the medical severity of the claimant's impairments.  Id. at § 404.1520(a)(4)(ii).  The claimant's impairment will not be deemed severe "[i]f [he or she] do[es] not have any impairment or combination of impairments which significantly limits [his or her] physical or mental ability to do basic work activities."  Id. at § 404.1520©.  Third, if it is found that the claimant's impairments are severe, the Commissioner will determine if the claimant has an impairment that meets or equals one of the impairments presumed severe enough to render one disabled, listed in Appendix 1 to Part 404, Subpart P of the Social Security Regulations.  See id. at § 404.1520(a)(4)(iii),(d).  If the claimant's impairments are not on the list, the Commissioner considers all the relevant medical and other evidence and decides the claimant's residual functional capacity.  See id. at § 404.1520(e).  Then, the Commissioner proceeds to the fourth step to determine whether the claimant can do his or her past relevant work.  See id. at § 404.1520(a)(4)(iv),(e)-(f).  Finally, if it is found that the claimant cannot do his or her past relevant work, the Commissioner will consider the claimant's residual functional capacity, age,

education, and work experience to see if he or she can make an adjustment to other work.  <u>See</u> <u>id.</u> at § 404.1520(a)(4)(v),(g).

The claimant bears the burden of proof on the first four steps of this analysis.  <u>DeChirico</u> <u>v. Callahan</u>, 134 F.3d 1177, 1180 (2d Cir. 1998) (citation omitted).  If the ALJ concludes at an early step of the analysis that the claimant is not disabled, he or she need not proceed with the remaining steps.  <u>Williams v. Apfel</u>, 204 F.3d 48, 49 (2d Cir. 2000).  If the fifth step is necessary, the burden shifts to the Commissioner to show that the claimant is capable of other work.  <u>DeChirico</u>, 134 F.3d at 1180 (citation omitted).

## III.  DISCUSSION

In deciding Plaintiff's case, the ALJ applied the required five-step sequential analysis set forth in the regulations.  First, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since his alleged onset date of October 3, 2003.  AR 24.  Second, he found that the medical evidence established that Plaintiff suffered from tendonitis and myositis of the flexor muscles of the left forearm, impairments that are "severe" within the meaning of the Social Security Regulations.  <u>Id.</u>  Third, the ALJ found that Plaintiff's impairments did not meet or equal in severity any category of the Listing of Impairments found in Appendix 1 to Subpart P of Part 404 of the Social Security Regulations.  <u>Id.</u>  Therefore, he went on to determine Plaintiff's residual functional capacity and concluded that Plaintiff "had the capacity to perform the physical exertion and nonexertional requirements of work except for lifting/carrying more than 5 pounds with his left upper extremity or 20 pounds with both upper extremities, or using his left hand to reach or perform gross or fine manipulative activities."  <u>Id.</u>

At the fourth step in the analysis, the ALJ found that Plaintiff could not return to his past relevant work, but that Plaintiff retained the capacity to "perform light work of a one-armed

nature during the period in question." AR 24.  At the fifth step in the analysis, the ALJ relied

upon the medical vocational guidelines (the "grids") contained in 20 C.F.R. Part 404, Subpart P,

Appendix 2, taking into account Plaintiff's residual functional capacity, age, education, and work

experience. Id. 24-25.  The ALJ found that Plaintiff was 51 years old when he alleged he

became disabled and 52 years old as of his date last insured.  Id. 24.  Thus, for purposes of his

decision, the ALJ identified Plaintiff as "closely approaching advanced age" at all pertinent

times.  Id.  The ALJ found that Plaintiff had a "limited" education.  Id.  The ALJ also found that

Plaintiff's past relevant work was "unskilled."  AR 24.

The ALJ found that Plaintiff's "capacity for light work was not significantly eroded by

his additional nonexertional limitations during the period October 3, 2003 to March 31, 2004"

and "[t]herefore, utilizing Rule 202.10 in Table No. 2 of Appendix 2, Subpart P, Regulation No.

4 as a framework for decisionmaking, a finding of 'not disabled' is indicated in this case."  AR

25. Consequently, the ALJ determined that Plaintiff was not under a disability within the

meaning of the Act at any time before March 31, 2004, and he concluded that Plaintiff was not

entitled to a period of disability or disability insurance benefits under the Act.  Id.

In his motion papers, Plaintiff contends that the Commissioner failed to use the proper

legal standards in evaluating whether Plaintiff could perform work existing in the national

economy.  See Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Judgment on

the Pleadings.  Specifically, Plaintiff contends that the Commissioner ignored Social Security

Rulings 83-10, 83-12 and 83-14; failed to properly consider the definition of a full range of light

work; ignored the treating physician rule; and failed to give proper weight to or properly

evaluate the treating physician's opinion.  See id.  Thus, Plaintiff asks this Court to find that he is

entitled to disability benefits and/or to remand the case for further hearing to the Commissioner.

Id.  In response, the Commissioner cross-moves for judgment on the pleadings, contending that the ALJ's decision is supported by substantial evidence.  Docket # 10.

### A.      The Medical Opinion Evidence

Under the Social Security regulations, a treating physician's opinion regarding the nature and severity of a claimant's impairments will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record."  20 C.F.R. § 404.1527(d)(2); Diaz v. Shalala, 59 F.3d 307, 313 (2d Cir. 1995).  If a treating physician's opinion is not given controlling weight, then various factors are applied in determining what weight to give it: (i) the length of the treatment relationship and the frequency of examination; (ii) the nature and extent of the treatment relationship; (iii) the extent to which the medical source provides relevant evidence to support an opinion; (iv) the extent to which the opinion is consistent with the record as a whole; (v) whether the opinion is given by a specialist; and (vi) other factors which may be brought to the attention of the ALJ.  Id. at § 404.1527(d)(2)(i)-(ii), (d)(3)-(d)(6).  The Commissioner "will always give good reasons in [his or her] notice of determination or decision for the weight [he or she] give[s] [a claimant's] treating source's opinion."  Id. at § 404.1527(d)(2).  "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand."  Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999).  Certain findings, however, such as whether a claimant is disabled and cannot work, are reserved to the Commissioner.  20 C.F.R. § 404.1527(e)(1).  In other words, "a treating physician's statement that the claimant is disabled cannot itself be determinative."  Snell, 177 F.3d at 133.

In this case, Plaintiff argues that the ALJ failed to give proper weight to the opinion of

his treating physician, Dr. Baptiste.[11]  Plaintiff argues that Dr. Baptiste reported that Plaintiff was basically disabled and unable to work due to his significantly limited left upper extremity tremor, and therefore the ALJ should have reached the same conclusion.  The report to which Plaintiff refers, set forth in Section I(B)(1)(a), *supra*, is an April 1, 2005, memorandum signed by Dr. Baptiste.  However, in that memorandum, Dr. Baptiste stated, "I do not feel the patient is able to do full time competitive work due to his left upper extremity disability, *and with his right upper extremity hemiparesis*." AR 272 (emphasis added).  Plaintiff suffered a stroke on January 15, 2005, significantly limiting his abilities.  While Dr. Baptiste noted that Plaintiff's activities were significantly limited by his left upper extremity tremor, it appears that Dr. Baptiste reached her conclusion that Plaintiff could not perform "full time competitive work" based on her assessment not only of Plaintiff's limitations prior to his stroke (i.e. left upper extremity tremor), but also following his stroke (i.e. left upper extremity tremor *and* right upper extremity hemiparesis). This is further demonstrated when reviewing Dr. Baptiste's notation on a June 15, 2004, disability determination evaluation that "[she] cannot provide a medical opinion regarding [Plaintiff's] ability to do work-related activities."  AR 137.  It was only after Plaintiff suffered his stroke, and in part as a result of the limitations caused by his stroke, that Dr. Baptiste concluded that Plaintiff could not perform "full time competitive work."  Moreover, even if Dr. Baptiste had opined that Plaintiff was disabled and could not work as a result of his left upper extremity tremor, such a statement could not in itself be determinative, as the finding as to whether Plaintiff is disabled and cannot work is a decision reserved to the Commissioner.  20 C.F.R. §

---

[11] In his memorandum of law, Plaintiff names his treating physician as "Dr. Karen Baptiste," however, it appears from the medical records that Plaintiff's treating physician was Dr. Kimberly Baptiste.

20

404.1527(e)(1); <u>Snell</u>, 177 F.3d at 133.

Additionally, Plaintiff argues that Dr. Baptiste's opinion is consistent with other substantial evidence.  Yet, Plaintiff's argument supposes that the ALJ failed to give controlling weight to Dr. Baptiste's opinion, of which there is no indication in the ALJ's findings.  In his decision, the ALJ referenced Plaintiff's medical records in chronological order, beginning with Plaintiff's visit to Dr. Baptiste on February 10, 2004, and concluding with Dr. Baptiste's completion of the April 1, 2005, impairment questionnaire.  AR 21-22.  Following the review of Plaintiff's medical records, the ALJ specifically stated that, "[he] gives the claimant the benefit of the doubt and finds that during the pertinent period [], the claimant had the left upper extremity limitations cited by Dr. Baptiste in his [sic] April 1, 2005 questionnaire ...."  <u>Id.</u> 23.  There is nothing in the ALJ's decision suggesting the ALJ gave anything less than controlling weight to Dr. Baptiste's opinion.

### B.    Plaintiff's Remaining Occupational Base

In determining whether Plaintiff could make an adjustment to other work, as required by the fifth step in evaluating a disability claim, the ALJ considered Plaintiff's age, education, work experience, and residual functional capacity.  The ALJ found that Plaintiff was 51 years old when he became disabled and 52 years old as of his date last insured.  AR 24.  Thus, for purposes of his decision, the ALJ identified Plaintiff as "closely approaching advanced age" at all pertinent times.  <u>Id.</u>  The ALJ also found that Plaintiff had a "limited" education, and that Plaintiff's past relevant work was "unskilled."  <u>Id.</u>  Additionally, in assessing Plaintiff's residual functional capacity, the ALJ found that Plaintiff "retained the capacity to perform light work of a one-armed nature during the period in question."  <u>Id.</u>

With this information, the ALJ consulted the medical vocational guidelines (the "grids")

contained in 20 C.F.R. Part 404, Subpart P, Appendix 2.  AR 24.  The ALJ specifically consulted Rule 202.10 within Table No. 2, which directs a finding of not disabled for an individual "closely approaching advanced age," with a "limited or less" education, and "unskilled or [no]" previous work experience, who can perform a full range of light work.  Id.; see also SSR 83-10, 1983 WL 31251, at *3 (S.S.A. 1983)("In the situations considered in the numbered table rules (those indicating decisions of 'Disabled' as well as 'Not disabled'), an individual has the [residual functional capacity] to perform a full range of the unskilled occupations relevant to the table."). The ALJ then stated, "*[i]f* the claimant were found capable of performing the full range of light work" considering his age, education, and past work experience, Rule 202.10 would direct a conclusion that he was not disabled.  AR 23 (emphasis added).  While the hypothetical may be true, the ALJ's finding that Plaintiff "retained the capacity to perform light work of a one-armed nature," supposes that Plaintiff could not, in fact, perform the *full* range of light work, and calls into question the ALJ's exclusive reliance on the "grids" in forming his ultimate disability determination.

Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b).[12]  Further, "[e]ven though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  Id.  The regulation provides that, "[t]o be considered capable of

---

[12] The Social Security Administration has further explained that " '[f]requent' means occurring from one-third to two-thirds of the time.  Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday.  The lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping."  SSR 83-10, 1983 WL 31251, at *6.

performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities.  If someone can do light work, [the Commissioner] determine[s] that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  Id.; 20 C.F.R. Part 404 App. 2 Rule 202.00 ("[t]he functional capacity to perform a full range of light work includes the functional capacity to perform sedentary as well as light work.").  Additionally, many unskilled light jobs "require gross use of the hands to grasp, hold, and turn objects."  SSR 83-14, 1983 WL 31254, at *4 (S.S.A. 1983).

Having made the assessment that Plaintiff could perform light work of only a one-armed nature (due to loss of use of his upper left extremity), the ALJ determined that Plaintiff also exhibited a nonexertional limitation in that Plaintiff was limited to occupations which did not require bilateral manual dexterity (due to his inability to manipulate with the left hand).[13]  While it appears that the ALJ's determination that Plaintiff could perform light work of a one-armed nature encompasses Plaintiff's exertional (strength) and nonexertional (manipulation) limitations because both stem from the upper left extremity, it is important to distinguish between these limitations for purposes of Plaintiff's capacity to perform other work.

Plaintiff was unable to perform the full range of light work due to his inability to meet the strength (exertional) requirements of the full range of light work, at least this is so with respect to his left upper extremity.  Plaintiff's ability to perform the full range of light work was

---

[13] When a claimant has difficulty performing the "manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling or crouching," such limitations are considered nonexertional.  20 C.F.R. § 404.1569a(c)(1)(vi);  see also SSR 83-14, 1983 WL 31254, at *2 (using fingers and finger tips to work with small objects considered nonexertional activity).

further diminished by his manipulative (nonexertional) limitation, as light work may require the pushing and pulling of arm restraints and the use of both hands to grasp, hold and turn objects. Plaintiff's inability to manipulate with his left hand also limited, to some degree, Plaintiff's ability to perform the full range of sedentary work,[14] which is generally included in the functional capacity to perform the full range of light work.  Yet, without any analysis, the ALJ jumped to the finding that despite these limitations, Plaintiff's occupational base was not significantly eroded, and therefore, Plaintiff was not disabled.  AR 23.

The ALJ's failure to discuss Plaintiff's diminished capacity to perform certain work as a result of his limitations, and Plaintiff's resulting diminished occupational base, to whatever degree, is significant to the ALJ's decision.  SSR 83-12, while a framework for adjudicating claims in which an individual has *only* exertional limitations, suggests that in cases where a person has lost the use of an upper extremity, that person "obviously cannot perform jobs which require use of both arms or both hands.  Loss of major use of an upper extremity is rather definitive in that there is a considerable absence of functional ability."  SSR 83-12, 1983 WL 31253, at *4 (S.S.A. 1983).  SSR 83-12 further suggests that "[w]hile individuals with this impairment have been known to perform selected occupations at nearly all exertional levels, the total number of occupations with their RFC's is less than the number represented by a full or wide range of light work."  Id.  With the loss of an upper extremity, "a [vocational specialist] will be able to determine the size of the remaining occupational base, cite specific jobs within the individual's RFC, and provide a statement of the incidence of those jobs in the region of the individual's residence or in several regions of the country."  Id.

---

[14] "Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions."  SSR 83-10, 1983 WL 31251, at *5.

"While there is no requirement to cite unskilled occupations where the criteria of a rule are met," the criteria of Rule 202.10 were not met here, as Plaintiff was unable to perform the full range of light work.  SSR 83-10, 1983 WL 31251, at * 4.  Therefore, the ALJ erred in relying exclusively upon the "grids" to reach his ultimate decision.  See 20 C.F.R. Pt. 404 App. 2 § 200.00(b)("when all factors coincide with the criteria of a rule, the existence of such jobs is established."  But when the criteria are not met, the existence of jobs must be "further considered in terms of what kinds of jobs or types of work may be either additionally indicated or precluded."); see also Rosa v. Callahan, 168 F.3d 72, 78 (2d Cir. 1999)("[a]lthough the grid results are generally dispositive, exclusive reliance on the grids is inappropriate where the guidelines fail to describe the full extent of a claimant's physical limitations."); Bapp v. Bowen, 802 F.2d 601, 605 (2d Cir. 1986)(the language of the regulations "indicates that in a case where both exertional and nonexertional limitations are present, the guidelines cannot provide the exclusive framework for making a disability determination.").

Rather than considering whether testimony, or other similar evidence, was necessary to assist in determining Plaintiff's remaining occupational base in light of Plaintiff's exertional and nonexertional limitations, the ALJ merely stated, without any evidential support, that Plaintiff's limitations did not significantly erode his occupational base.  An ALJ must set forth the basis of his finding "with sufficient specificity to enable [a reviewing court] to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984).  The ALJ erred in failing to explain the basis for his finding that Plaintiff's limitations did not significantly erode his occupational base.

It is certainly within the realm of possibility, and quite likely, that due to Plaintiff's capacity to perform work of only a one-armed nature, there are certain "light" jobs that Plaintiff

could not perform.  It is also possible, and quite likely, that based upon the requirements of

"sedentary work," there are certain "sedentary" jobs that Plaintiff could not perform, further

narrowing his remaining occupational base.  Although Plaintiff's remaining occupational base, as

the ALJ found, may not have significantly eroded as a result of Plaintiff's limitations, the ALJ

provided no explanation as to how he reached that determination, what resources he used in

reaching his determination, and failed to set forth the slightest sample of jobs in the national

economy that Plaintiff could perform at his capacity.  The ALJ did exhibit an understanding of

Plaintiff's limitations, but the Court cannot conclude that substantial evidence exists in the ALJ's

decision to support his determination as to the erosion of Plaintiff's occupational base.

   That is not to say that the ALJ necessarily reached the wrong determination as to

Plaintiff's remaining occupational base or the ultimate conclusion that Plaintiff was not disabled.

The ALJ need not provide a comprehensive list of occupations that remain for Plaintiff's taking

nor an exhaustive account of the basis for his determination that Plaintiff's occupational base was

not significantly eroded.  The ALJ must, however, provide a reasonable analysis so that the court

can assess whether there is substantial evidence to support his conclusion that Plaintiff's

occupational base was not significantly eroded.  See Berry v. Schweiker, 675 F.2d 464, 468 (2d

Cir. 1982)(absence of an "express rationale" does not prevent the court from upholding the ALJ's

decision as the conclusion was supported by substantial evidence).

   According to the regulations, "[i]n order to support a finding that [the claimant] is not

disabled at [the] fifth step of the sequential evaluation process, [the Commissioner is]

responsible for providing evidence that demonstrates that other work exists in significant

numbers in the national economy that [the claimant] can do, given [the claimant's] residual

functional capacity and vocational factors."  20 C.F.R. § 404.1560(c)(2); see also 20 C.F.R. §

404.1512(g) (requiring Commissioner provide evidence about the existence of work in the national economy given claimant's residual functional capacity, age, education and work experience).  As such, on remand, it is respectfully recommended that the ALJ require the Commissioner to present testimony of a vocational expert, or other similar evidence, regarding the existence of jobs in the national economy for an individual with Plaintiff's recognized limitations, or the ALJ shall reasonably explain why Plaintiff's limitations, both exertional and nonexertional, are not significant enough to warrant such presentation of testimony or evidence.

### C.   The Appropriate Remedy

Under sentence four of § 405(g), the court "shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  As the Second Circuit has stated, "'Where there are gaps in the administrative record or the ALJ has applied an improper legal standard, we have, on numerous occasions, remanded to the [Commissioner] for further development of the evidence.'"  Rosa, 168 F.3d at 82-83 (quoting Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)).  "Furthermore, remand is warranted if further findings or explanation will clarify the rationale for the ALJ's decision."  Groff v Commissioner, 2008 WL 4104689, at *12 (N.D.N.Y. Sept. 3, 2008)(internal quotation marks and citation omitted).

As explained above, the ALJ failed to develop the record as required by the Social Security regulations.  The Court must determine whether to remand for further consideration or for calculation of benefits owed to the Plaintiff.  The action the ALJ shall take, as explained above, will form a comprehensive record, and it is conceivable that as a result, the ALJ will justifiably conclude that Plaintiff is not disabled.  Therefore, I conclude, and respectfully

recommend that Your Honor should conclude, that the case be remanded for further administrative proceedings to develop a comprehensive record of which the ALJ may make appropriate findings.

## CONCLUSION

For the foregoing reasons I conclude, and respectfully recommend that Your Honor should conclude, that the Plaintiff's motion for remand should be granted, the Commissioner's motion for judgment on the pleadings (Docket #'s 9, 10) should be denied, and the Commissioner's determination should be remanded for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).[15]

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days, plus an additional three (3) days, pursuant to Fed. R. Civ. P. 6(d), or a total of seventeen (17) days, see Fed. R. Civ. P. 6(a), from the date hereof, to file written objections to this Report and Recommendation.  Such objections, if any, shall be filed with the Clerk of the Court with extra copies delivered to the chambers of The Honorable Kenneth M. Karas at the United States Courthouse, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at the same address.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

---

[15] As a remand pursuant to sentence four, the Court's decision would constitute a final judgment, and the Clerk of the Court would be directed to close the case.  See generally Shalala v. Schaefer, 509 U.S. 292, 297-99 (1993) ("a sentence-four remand order terminates the civil action seeking judicial review of the [Commissioner's] final decision") (internal quotation marks, alteration, and citation omitted).

Requests for extensions of time to file objections must be made to Judge Karas.

Dated: March 14, 2011
       White Plains, New York

Respectfully submitted,

_____
Lisa Margaret Smith
United States Magistrate Judge
Southern District of New York

A copy of the foregoing Report and Recommendation has been sent to the following:

The Honorable Kenneth M. Karas, U.S.D.J.

Counsel of Record for Plaintiff and the Commissioner of Social Security